UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 6:22-cr-171-WWB-EJK

BILLIE HAROLD MCDUFFIE, JR.,

## UNITED STATES' SENTENCING MEMORANDUM

*"I could get in trouble if u got caught with me"*

*"I'm scared Brooklyn[1]"*

*"I've been cumming in u"*

*"Are u gonna be there when I get home"*

*"We will figure it out"*

-McDuffie's response to learning the victim's true age (15)

\*\*\*

Billie Harold McDuffie, Jr., engaged in a sexual relationship with the child victim, B.W., for 4 months after learning her true age.

From February 6, 2022, through July 22, 2023, the Defendant engaged in a sexual relationship with 15-year-old B.W. While it is true that B.W. originally told the Defendant she was an adult the Defendant did not hesitate to continue his sexual relationship with B.W. despite learning she was a minor. *See* Exhibit 1.

---

[1] This is not the child victim's actual name; however, it is what the Defendant called her.

The Defendant's offense level is 37 and his criminal history category is III. This makes his guidelines range 262 months to 327 months in the bureau of prisons notwithstanding the minimum of 2 years of consecutive incarceration that must be imposed for counts 4 through 6. The United States respectfully requests a low-end guidelines sentence in this case, on grounds that it will achieve the purposes of sentencing because it will reflect the seriousness of the Defendant's offense of conviction and relevant conduct, promote respect for the law, provide just punishment, afford adequate deterrence, and protect children from further crimes of the Defendant.

## BACKGROUND

On July 19, 2022, the FBI received an online tip in reference to the Defendant and his "relationship" with the child victim. The tip also stated that the Defendant was involved in various fraudulent activities, to include check and credit card fraud. Upon receipt of the CyberTip a forensic interview was conducted with B.W. where she disclosed, she became sexually active with the Defendant the one week after meeting him. B.W. also spoke about the fraudulent activity the Defendant was committing.

For five months the Defendant engaged in a sexual relationship with B.W. – four of those months he knew she was a minor. B.W. was a runaway from home and lived with the Defendant for approximately half of their inappropriate relationship. Once B.W. returned home the Defendant continued to see B.W. and engage in

sexual intercourse with B.W. while her mother was at work. During the "relationship" the Defendant sent B.W. sexually explicit text messages and photos. *See* Exhibit 2[2]. He also called B.W. terms of endearment such as "baby" and told her that he loved her and missed her. *Id.* The "relationship" between the Defendant and B.W. did not end until the Defendant was arrested by local authorities on July 22, 2022. In fact, B.W. was at the Defendant's home in the back of the residence laying in a bed. She exited the residence dressed in her underwear and shirt. While the Defendant has never been convicted of child sexual abuse this behavior spanned over several months, thus it was not a one-time lapse in judgement. Additionally, the Defendant was released from the Florida department of corrections on May 12, 2021, for multiple fraud convictions. *See* Exhibit 5.

    Upon executing a search warrant on the Defendant's residence and vehicle law enforcement found two fraudulent identification cards with the Defendant's picture and the name Travis McNair, a credit card encoding device, approximately thirty-nine fraudulent credit cards, two HP Desktop computers connected to an HP laser jet printer and an HP Office Jet Pro printer, an HP laptop with one Scan Disk flash drive attached, one Lenovo laptop computer, one iPhone, blank check paper, and personal identification information of multiple individuals. In a bookcase inside the residence's living room special agents located a packet that contained social security numbers, birth dates, copies of driver's licenses, and other PII information of

---

[2] There are months of text messages between the Defendant and B.W. Exhibit 2 is an extremely small sample of the messages.

five different individuals that did not reside at the residence. *See* Exhibit 4.[3]

Most of the credit cards found in the Defendant's residence and vehicle were in the name of "Travis McNair." When the fraudulent credit cards were scanned it was found that the numbers on the front of the card, did not match the real account numbers. Fifteen or more of the cards scanned matched accounts of real account holders. Some of those account holders resided out of the state of Florida and none of them authorized the defendant to have access to their credit card numbers.

Additionally, agents sent subpoenas to: Navy Federal Credit Union, Lake Michigan Credit Union, Bank of America, and American Airlines credit Union. Each of those financial institutions responded to the subpoenas by confirming that the scanned account numbers belonged to actual customers of their institutions. Each of the previously mentioned financial institutions are headquartered outside of the state of Florida. Agents contacted many of the victims of the Defendant's fraud, including C.T., J.S., and M.S., each of whom disclosed they did not know the Defendant or "Travis McNair." They expressed that they did not give the Defendant permission to access or use their accounts nor did they know how he obtained their information.

Upon review of the Defendant's phone, agents found chats he had with multiple individuals on the Telegram chat platform. During the chats the Defendant talked with other users about how to obtain fraudulent credit cards, gain access to

---

[3] The exhibit does not contain close pictures of each item found because many of the items were intended to be admitted as physical exhibits in trial.

banking accounts, apply for unemployment, make fraudulent credit cards, and other means of fraudulently obtaining access to or opening accounts to deposit proceeds of fraudulent activity.

## ARGUMENT

A. <u>The Nature and Circumstances of the Offenses</u>

The nature, circumstances, and extent of the defendant's criminal offenses are extremely serious and weigh in favor of a low-end guidelines sentence. *See* 18 U.S.C. § 3553(a)(1). The Defendant continued to engage in a sexual relationship with B.W. even after her mother told him that B.W. was a child and that she wanted him to bring B.W. home. The Defendant did not take B.W. home, instead he continued to talk to B.W. after her mother picked B.W. up and took her home. The Defendant even snuck into B.W.'s home and had sexual intercourse with B.W. *See* Exhibit 3.

Essentially, the Defendant deliberately took advantage of a troubled and vulnerable teenager. He used profanity and degraded her when he was angry with her. He groomed her when he wasn't angry. He sent her loving messages, compliments, and photos to get her to continue to engage in their "relationship." He even included B.W. in his fraudulent activity by giving her fraudulent credit cards to purchase food.

The Defendant used the "darknet" to purchase credit card numbers and other PII. He even had physical PII packets obtained from a local car dealership. The Defendant admitted to law enforcement officers that he purchased credit card numbers from individuals via the "darknet," followed by the purchase of credit cards

from other users on the "darknet." The Defendant's behavior was intentional and ongoing. He had no intention to cease his behavior before his local arrest for the charged conduct. Thus, his actions weigh in favor of a guidelines sentence.

    B.  <u>The History and Characteristics of the Defendant</u>

The Defendant's history and characteristics also weigh in favor of the sentence that the United States seeks. The Defense sentencing memorandum as well as the final presentence investigation report (PSR) both pointed out the Defendant's mental health issues, substance abuse issues, and the fact that B.W. initially concealed her age from the Defendant as possible reasons for a downward variance. Docs. 117, 119.

The Defense claimed that the Defendant ended his "relationship" with B.W. but resumed it because he had already grown "feeling" for B.W.   Here's the problem: the Defendant's texts with the victim belie this assertion. *See* Exhibit 1 at 478 – 494. B.W. and the Defendant talked about B.W.'s age for the span of 10 minutes and not once did the Defendant end their "relationship"; in fact, after he expressed his fear of getting in trouble he asked B.W. to cook for him, ultimately, he concluded the discussion with "We will figure it out". Additionally, it was evident that B.W. was a minor even before she disclosed her true age to the Defendant. B.W. disclosed to agents that the Defendant's cousin saw B.W. and heard her talking while he was video chatting with the Defendant. The cousin asked the Defendant how old B.W. was. After the Defendant told him that B.W. was 18, the cousin replied that

B.W. was not an adult. The Defendant knew his conduct was wrong, yet he chose to continue it with the 15-year-old victim.[4]

While it is clear that the Defendant suffered the loss of his parents and may have substance abuse issues, this also is not a reason for a downward variance in this case. In order for the Defendant to truly recover from substance abuse issues he must acknowledge he has a problem. The Defendant repeatedly told agents during his post *Miranda* interview that he does not do drugs, did not have any drugs, and does not have a drug problem. Either he was being truthful and he doesn't have a substance abuse problem or he was being dishonest and he does have a substance abuse problem – both situations lead to an individual who is not ready to acknowledge the truth and benefit from treatment. Also, substance abuse treatment and mental health treatment are both available in the Florida department of corrections which means the Defendant previously had the opportunity to obtain such treatment and chose not to. He should not benefit from that choice now.

The Defense points out that Dr. McClain opined that the Defendant is a low risk to reoffend.[5] The Defendant's crimes in this case directly dispute that assertion as the Defendant has previously been convicted of committing fraudulent activity.[6] The Defendant's previous incarceration did not prevent him from committing similar

---

[4] B.W. turned 16 in April of 2022; however, her "relationship" with the Defendant was still illegal.
[5] While this evaluation was focused on the psycho-sexual aspect of the Defendant it does not change that he is a repeat offender of illegal conduct.
[6] The details of the Defendant's prior fraudulent conduct are summarized on page 17 of the final PSR.

conduct. That said, the Defendant is not a first-time offender further supporting that a downward variance is not warranted in this case.

###    C. Just Punishment, Adequate Deterrence, Respect for the Law, and Protection of the Public

A guidelines sentence meets the sentencing goals of adequate deterrence, respect for the law, protection of the public, and just punishment in this case. Deterrence and protection of the public are particularly weighty factors in this case. The Defendant actively committed fraud against on multiple accounts and he continuously engaged in a sexual relationship with a minor. "The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others." *United States v. Irey,* 612 F.3d 1160, 1212 (11th Cir. 2010).

Moreover, the defendant has demonstrated that he is a danger to the public—particularly young, impressionable teenagers. "Congress [has] explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders." *United States v. Allison,* 447 F.3d 402, 405-06 (5th Cir. 2006); *see also United States v. Pugh,* 515 F.3d 1179, 1201 (11th Cir. 2008) ("As Congress has found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported."). The Defendant took advantage of B.W.'s immaturity, youth, and home situation in order to engage in a sexual relationship with her for months solidifying that he is a danger to the public.   A guidelines sentence will protect children from further crimes of the defendant.

## **CONCLUSION**

Moreover, the Defendant's criminal conduct spanned a period of time. This was not a one-off (albeit extremely serious) lapse of judgment. Quite the opposite, it was a course of conduct that continued all the way until the day of the Defendant's interview with the police. That timing strongly suggests that his conduct stopped only because he was caught by the police—and he knew it. The Defendant's criminal conduct was deliberate, calculated, and predatory. The Defendant's egregious course of conduct weighs in favor of a low-end guidelines sentence.

                Respectfully submitted,

                ROGER B. HANDBERG
                United States Attorney

By:   */s/ Courtney D. Richardson-Jones*
       Courtney D. Richardson-Jones
       Assistant United States Attorney
       Florida Bar No.: 91608
       400 W. Washington Street, Suite 3100
       Orlando, Florida 32801
       Telephone: (407) 648-7500
       Facsimile: (407) 648-7643
       E-mail: courtney.richardson-jones@usdoj.gov

**U.S. v. MCDUFFIE, JR.,**  Case No. 6:22-cr-171-WWB-EJK

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Corey I. Cohen, Esq.
Attorney for Defendant

Mary Ibrahim, Esq.
Attorney for Defendant

/s/ *Courtney D. Richardson-Jones*
Courtney D. Richardson-Jones
Assistant United States Attorney
Florida Bar No.: 91608
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: courtney.richardson-jones@usdoj.gov